UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| ANDREW H. PEARS, **Administrator for the Estate of JONATHAN PEARS, deceased, and Individually,**     Plaintiff, <br><br> v. <br><br> **JACOB BODDIE, in his individual capacity, et al.,**     Defendants. | Case No. 2:21-cv-668-CLM-JTA |

## MEMORANDUM OPINION

Jonathan Pears was a veteran who served his country by fighting the Taliban in Afghanistan. After returning home to Alabama, Jonathan suffered from PTSD. On July 28, 2021, Jonathan's parents became concerned that Jonathan was experiencing a psychotic break and called the police to their Elmore County home. When deputy sheriffs arrived, Jonathan emerged from the house holding a knife, and Deputy Jacob Boddie shot and killed him. Jonathan's father Andrew Pears, as the administrator of Jonathan's estate, sues Boddie under 42 U.S.C. § 1983, asserting that Boddie's use of deadly force violated Jonathan's constitutional right to be free from excessive force. Mr. Pears also sues Officer Arnold Oliver, III for allegedly using excessive force against Mr. Pears by throwing Mr. Pears to the ground when the deputies arrived at the Pears' home.

Boddie and Oliver move for summary judgment (doc. 88). For the reasons stated within, the court **GRANTS IN PART** and **DENIES IN PART** the motion (doc. 88). The court **GRANTS** Boddie's motion for summary judgment on the claim that he used excessive force when he shot Jonathan and will **DISMISS** that claim **WITH PREJUDICE**. The court **DENIES** Oliver's motion for summary judgment on the claim that he used excessive force when he threw Mr. Pears to the ground. By separate order, the court will set that claim for trial.

## STATEMENT OF FACTS[1]

Following his military service in Afghanistan and a short stint in Montana, Jonathan returned home to Elmore County, Alabama to live with his parents, Andy and Mary Pears. (Doc. 92-1, ¶¶3–4). After returning home, Jonathan suffered from PTSD, and according to Mrs. Pears, Jonathan was tormented with memories of his experiences in Afghanistan. (*Id.*, ¶ 5). So in March 2021, Jonathan began an in-patient program at the VA in Tuskegee. (*Id.*, ¶ 6).

Two months later, Jonathan completed the in-patient program and returned home to his parents. (*Id.*, ¶ 7). Jonathan then started a new job at Engineering Cooling Services and seemed to be doing well. (*Id.*, ¶ 8). But Mrs. Pears began noticing that Jonathan was appearing upset and depressed like he had before his in-patient treatment at the VA. (*Id.*, ¶ 9). Mrs. Pears also learned that Jonathan had stopped taking his medications. (*Id.*, ¶ 11).

### A.   Events Leading Up to 911 Calls

On July 28, 2021, after taking a 4:30 pm class at Orange Theory Fitness in Montgomery, Mrs. Pears returned home, showered, and changed into her pajamas. (*Id.*, ¶ 13). While Mrs. Pears was showering, Jonathan came home. Jonathan then showed Mr. and Mrs. Pears a new pistol he had purchased. (*Id.*, ¶¶ 14–15). Jonathan had also bought a rifle that remained unassembled on the dining room table. (*Id.*, ¶ 16). Jonathan seemed combative and intoxicated, which concerned Mrs. Pears. (*Id.*, ¶ 17). Jonathan then became upset with Mrs. Pears. Jonathan blamed his mom for making him complete the in-patient VA program and asked, "How would you like it if someone made you go in-patient against your will Momma?" (*Id.*, ¶¶ 18–19).

---

[1] This court's initial order requires the non-moving party, in its response to a motion for summary judgment, to list in separately numbered paragraphs any disputes it has with the moving party's statement of undisputed facts. (*See* Doc. 74, p. 18). "All material facts set forth in the statement required of the moving party will be deemed admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment." (*Id.*). Pears' "response to moving party's statement of facts" doesn't explain whether or why he disputes the facts in Defendants' statement of undisputed facts; instead, he has merely added to Defendants' facts by citing to his and his wife's declarations. (*See* Doc. 93, pp. 3–18). So the court will consider admitted all of Defendants' facts supported by the record evidence and not contradicted by Pears' cited evidence. But because Pears is the non-moving party, the court also assumes all facts asserted by Pears and supported by some record evidence are true.

Mrs. Pears returned to the master bedroom. (*Id.*, ¶ 21). A short time later, Mrs. Pears heard a loud knock on the bedroom door. (*Id.*, ¶ 22). Jonathan opened the door telling Mrs. Pears, "They're here for you." (*Id.*). Mrs. Pears then learned that Jonathan had called 911 reporting that she was suffering from a mental health emergency. (*Id.*, ¶ 23). Mrs. Pears assured the paramedics, who were behind Jonathan in the hallway, that she was okay, and the paramedics left. (*Id.*, ¶ 24).

At some point, Mr. Pears tried to deescalate the situation between Jonathan and Mrs. Pears by taking Jonathan into the woods to fire a few rounds with his new pistol. (Doc. 92-2, ¶¶ 4–5). After Jonathan fired one round, he and Mr. Pears returned home. (*Id.*, ¶ 5). Soon after reentering the house, Jonathan again sounded agitated. (*Id.*, ¶ 6). Mr. Pears asked Jonathan to give him the pistol, but Jonathan refused. (*Id.*). And when Mr. Pears tried to take the gun away from Jonathan, Jonathan began wrestling Mr. Pears for the gun. (*Id.*, ¶ 7). In another attempt to deescalate the situation, Mr. Pears told Jonathan to punch him in the face. (*Id.*, ¶ 8). Jonathan did. (*Id.*). As Jonathan was kneeling on the living room floor, Mrs. Pears managed to grab the gun from his pants pocket, skitter the gun across the floor into her bedroom, and lock the bedroom door. (Doc. 92-1, ¶ 29).

B.     **911 Calls + Response**

After leaving the Pears' home, Dannie Haynes of Haynes Ambulance called the 911 dispatch at the Elmore County Sheriff's Office and reported that there was a domestic situation between a mother and son. Haynes also reported that the son was intoxicated and that the parents were talking about weapons in the home. A little while later, Mrs. Pears called 911 reporting that Jonathan was highly intoxicated, irate, and had punched Mr. Pears several times. (Doc. 89-1, p. 9).

While Mrs. Pears was speaking with the dispatcher, Mr. Pears was still wrestling with Jonathan and trying to get the pistol away from him. (Doc. 92-1, ¶ 28). And Mrs. Pears was still on the phone with the dispatcher when she secured the pistol in her bedroom. At that time, Mrs. Pears informed the dispatcher that the loaded gun was locked in her bedroom, and that Jonathan was no longer armed. (*Id.*, ¶ 30).

3

Mrs. Pears didn't understand why it was taking so long for anyone to arrive, but the dispatcher finally told her "the deputies were coming through the woods." (*Id.*, ¶¶ 32–33). Mrs. Pears begged the dispatcher to have the deputies come to the front door because she was inside the front entrance with Jonathan, who was now unarmed. (*Id.*, ¶ 35). When Jonathan overheard Mrs. Pears speaking to the dispatcher he said, "they're coming for me? I'm not going back," and his demeanor changed from being on the offensive to defense. (*Id.*, ¶¶ 36–37). Jonathan then kept stating, "I'm not going back! I'm not going back! I will defend myself," and ran upstairs. (*Id.*, ¶¶ 38–39). When Jonathan came back downstairs, he was holding a knife. (*Id.*, ¶ 39). Mrs. Pears pleaded with Jonathan to put the knife down and told the dispatcher that she was terrified of the deputies approaching the house "through the woods." (*Id.*, ¶ 40).

### C. Officers' Understanding

Dispatch informed Elmore County Sheriff's Deputies of the calls from Haynes and Mrs. Pears via the radio. (Doc. 89-7, pp. 15–16). Boddie understood from what dispatch was relaying to him that officers were needed at the Pears' home because there was a physical altercation between a father and son and that firearms were involved. (*Id.*, p. 16). Dispatch also reported that Jonathan was armed, threatening suicide by cop, and pointing the gun at his parents. (Doc. 89-1, p. 9). So Boddie and Deputy Sheriffs Demetrius Hooks and Matthew Eller decided to meet at a nearby fire station. (Doc. 89-7, p. 7; 89-9, p. 2). At the fire station, Boddie, Hooks, and Eller decided to approach the house through the woods to the left of the house to avoid a possible ambush. (Doc. 89-10, p. 3). Deputy Sheriff Tyler Smith also heard the call over the dispatch radio and began traveling to the Pears' home with Reserve Deputy-in-Training Edward Oliver, III. (Doc. 89-8, pp. 2–3).

While the deputies were on their way to the Pears' home, the dispatcher reported that Mrs. Pears had taken one gun from Jonathan but that he possibly still had a rifle on him. (Doc. 89-1, p. 10). Boddie also learned from dispatch that Jonathan had run up the stairs and had access to a knife. (Doc. 89-7, p. 25; 89-1, p. 10).

4

### D. The Shooting

1. <u>Pears' version</u>: Smith, Oliver, Boddie, Hooks. and Eller all arrived at the Pears' home at about the same time. After Mrs. Pears told Mr. Pears that police were approaching their residence, Mr. Pears slowly walked out the front door with his arms and hands extended to greet the officers and update them on the situation. (Doc. 92-2, ¶ 12). According to Mr. Pears, when he encountered the responding officers, they refused to listen to him and told him to put his hands up. (*Id.*, ¶ 14). Mr. Pears thought that was odd since his hands were already up and extended, but Mr. Pears complied by raising his hands higher. (*Id.*).

Oliver then handcuffed Mr. Pears, drug him toward the street, and tackled him. (*Id.*, ¶ 15). At some point, Mr. Pears lost consciousness, and he next remembers being near the bottom of his driveway, facing the road in front of his house, and being unable to breathe. (*Id.*, ¶¶ 16–17). Mr. Pears' chest was constricted because Oliver's knee was placing pressure on Mr. Pears' back. (*Id.*, ¶ 17). When Mr. Pears told Oliver he couldn't breathe, he released the pressure and turned Mr. Pears' body so that he was now facing the house. (*Id.*, ¶ 18). Mr. Pears then saw Jonathan walk out the front door of the house, turn to his right, and continue walking toward the Pears' property tree line to a spot parallel to the Pears' house. (*Id.*, ¶ 19). Jonathan did not approach Mr. Pears. (*Id.*).

When Jonathan first turned to his right after exiting the house, Mr. Pears heard an officer call out at least three times in rapid succession: "Drop the fucking knife." (*Id.*, ¶ 20). Mr. Pears says that almost immediately Jonathan slowed down like something had impacted him, and he heard two shots. (*Id.*, ¶ 21). Jonathan then dropped to the ground. (*Id.*). Mrs. Pears also heard loud voices screaming at Jonathan to "Drop the fucking knife and get down." (Doc. 92-1, ¶ 43). Seconds later, she heard a "pop, pop, pop," which she knew was gunfire. (*Id.*, ¶ 44).

Mr. Pears saw no person within 8 feet of his son when the shots were fired, and he had not seen more than two officers in his yard. (Doc. 92-2, ¶¶ 21–22). Only after Jonathan was shot did Mr. Pears see four or five officers gather about 15 feet in front of Mr. Pears' flagpole to converse. (*Id.*, ¶ 22). And

5

when Mrs. Pears ran outside after the shooting, she saw three deputies very close to the woods on her right. (Doc. 92-1, ¶ 50). A fourth deputy was kneeling beside Jonathan and wouldn't answer Mrs. Pears when she asked if he was dead. (*Id.*, ¶¶ 73, 79).

2. Deputies' version: The sheriff's deputies tell a slightly different story. According to Smith, when he arrived at the Pears' home, he saw a white male run out of the front door of the house. (Doc. 89-8, p. 3). Smith did not know that this man was Mr. Pears and told the man to stop and walk toward him. (*Id.*). Mr. Pears' complied. (*Id.*). Smith also ordered Mr. Pears to get to the ground, and Mr. Pears again complied. (*Id.*). Boddie then ordered Oliver and Smith to handcuff Mr. Pears, and Oliver handcuffed Mr. Pears and stood next to him while he was on the ground. (Doc. 89-7, p. 24; Doc. 89-11, p. 10).

Jonathan then emerged from the house carrying a machete style knife. (Doc. 89-7, p. 27). According to Smith, Jonathan began to fixate on his father, so he told Oliver to "get [Mr. Pears] out of here." (Doc. 89-8, p. 4). As a result, Oliver dragged Mr. Pears downhill in the front yard toward the street. (*Id.*). According to Boddie, at this point, he and the other deputies were about six feet apart from each other standing in a half-moon shape around the yard. (Doc. 89-7, p. 26). The deputies told Jonathan to drop the knife several times, but he never did. (Doc. 89-7, p. 27; Doc. 89-8, p. 4). Instead, the deputies say Jonathan became fixated on Boddie and started advancing toward him. (Doc. 89-8, p. 5; Doc. 89-10, p. 3). According to the deputies, when Jonathan was 10-15 feet away from Boddie, he said "fuck this," raised his knife, and lunged toward Boddie. (Doc. 89-7, p. 28; Doc. 89-8, p. 5). That's when Boddie fired three or four rounds at Jonathan, and he fell to the ground. (Doc. 89-7, p. 28).

After the shooting, paramedics were called, and Jonathan was pronounced dead at the scene. (Doc. 89-2, p. 68). The deputies estimate that from the time Jonathan opened the front door to the time he allegedly raised his knife was only about 10-15 seconds. (Doc. 89-8, p. 6). The knife recovered at the scene was a large machete-style knife that was about two feet long:

6



(Doc. 89-2, pp. 28, 63).

### E.  Mr. Pears' Injuries

The deputies cleared the house then took Mr. and Mrs. Pears to the Sheriff's Office for questioning. (Doc. 89-5, p. 39). Mr. Pears, who is diabetic and also suffers from PTSD, suffered a seizure while sitting in the back of the police car. (Doc. 92-2, ¶¶ 27–29). Because of his trauma, the seizure after-effects, and Mr. Pears' low blood sugar, Mr. Pears shut down and could not answer many of the investigator's questions about the shooting. (*Id.*, ¶¶ 31–34). After Mr. and Mrs. Pears spent several hours at the Sheriff's Office, their daughter Kayleigh and her husband were finally allowed to take them home. (Doc. 92-1, ¶¶ 86, 90).

The next day, Mr. Pears scheduled an appointment with the 42 Medical Group for his physical and psychological injuries. (Doc. 92-2, ¶ 37). Upon seeing Mr. Pears' bruising, the doctor exclaimed, "Oh my God, who did that to you." (*Id.*). Mr. Pears was referred to a physical therapist for injuries to his shoulder. While his shoulder wasn't separated, the doctors believed that it had been compressed. (Doc. 92-2, ¶ 37; Doc. 89-5, p. 55).

Mr. Pears attended physical therapy for a while, but he went on a trip to visit his parents and did not follow up with physical therapy after that. (Doc. 89-5, p. 55). Mr. Pears, however, still takes medication for the psychological problems he's suffered since the incident. (Doc. 92-2, ¶¶ 41, 43).

## STANDARD OF REVIEW

In reviewing a motion for summary judgment, this court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *See Cuesta v. Sch. Bd. of Miami-Dade Cty.*, 285 F.3d 962, 966 (11th Cir. 2002). Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## DISCUSSION

The court divides its discussion into two parts. First, the court will address Defendants' argument that the court should ignore Mr. Pears' declaration because it is a sham affidavit. Second, the court will address the merits of Defendants' motion for summary judgment.

### I. Sham Affidavit Rule

An affidavit or declaration may be disregarded "as a sham when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact and that party attempts thereafter to create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986) (cleaned up). Boddie and Oliver asks the court to apply this rule and ignore these statements from Mr. Pears' declaration:

> - Although dispatch or others may claim Jonathan was attempting 'suicide by cop' I never thought nor asserted to officers that Jonathan was suicidal. However, the responding officers refused to listen to me, and instructed me to put my hands up.

8

> - The officer then handcuffed me, dragged me towards the street, and tackled me.
>
> - I saw my son Jonathan walk out of the front door of the house, turn to his right, and continue walking toward our property tree line to a spot parallel to our house and about eight feet from the wall.
>
> - After Jonathan slowed down like something had impacted him, I heard two shots.
>
> - I saw no person within 8 feet of my son when the shots were fired.
>
> - No officers had been in sight in the front yard in a half circle until after Jonathan was shot and killed.
>
> - I heard the officers talking and trying to figure out who had fired the shots.
>
> - Although my shoulder was not separated, it had experienced extreme trauma.
>
> - ==One of the projectiles found was a shell casing from a Luger 9mm, which Jonathan had fired previously.==
>
> - ==The third projectile was never found.==
>
> - Mr. Pears does not agree with the assertion that Boddie's gun was fired from the location determined by the investigators.

(*See* Doc. 97, pp. 9–10, Doc. 92-2) (highlights added).

For the sham affidavit rule to apply, the statements in the affidavit must be "inherently inconsistent" with the affiant's deposition testimony. *Tippens*, 805 F.2d at 954. It is not enough for the affidavit to merely be "at odds with statements made in an early deposition." *Id.*

Applying this standard, the court finds that it should only disregard the highlighted statements as being "inherently inconsistent" with Mr. Pears' deposition testimony. A firearms report conducted by the Alabama Department of Forensic Sciences determined that the two bullets that struck Jonathan were fired from Boddie's Sig Sauer pistol. (Doc. 89-13, pp. 3–4). The firearms report also determined that the three cartridge cases that investigators recovered were fired from the Sig. (*See id.*). At his deposition, Mr. Pears was asked if he disagreed with anything in the firearms report or if he thought it was incorrect. (Doc. 89-5, p. 53). Mr. Pears responded, "[n]o, not at all." (*Id.*). So to the extent that Mr. Pears' declaration asks the court to infer that the recovered shell casings weren't from Boddie's weapon or that another weapon was used to shoot Jonathan, the court finds that these statements are inherently inconsistent with Mr. Pears' deposition testimony. Thus, consistent with Mr. Pears' deposition testimony and the sham affidavit rule, the court will view the summary judgment evidence as establishing that the bullets fired at Jonathan were from Boddie's Sig Sauer.

The other statements in Mr. Pears' declaration differ slightly from his deposition testimony. But they do not "flatly contradict" statements made during Mr. Pears' deposition. Thus, the discrepancies in testimony (if any) go only toward Mr. Pears' credibility, which the court cannot weigh at the summary judgment stage. *See Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1306–07 (11th Cir. 2016). As a result, the court will consider and accept these statements as true in ruling on Defendants' motion for summary judgment.

## II.  Motion for Summary Judgment

The Fourth Amendment protects citizens from "unreasonable searches and seizures," including excessive use of force by law enforcement. U.S. CONST. amend. IV. Mr. Pears alleges that Boddie used excessive force when he shot and killed Jonathan outside the Pears' home. Mr. Pears also alleges that Oliver used excessive force in tackling Mr. Pears, dragging him toward the street, and restraining Mr. Pears in a way that prevented Mr. Pears from breathing.

Boddie and Oliver assert the defense of qualified immunity. Qualified immunity protects government officials from being sued in their individual capacities so long as "their conduct 'does not violate clearly established

10

statutory or constitutional rights of which a reasonable person would have known.'" *Vineyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Eleventh Circuit applies a two-part test to determine whether a government official is entitled to the defense of qualified immunity. "First, the official must prove that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. Second, if the official meets that burden, the plaintiff must prove that the official's conduct violated clearly established law." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998) (citations omitted).

Mr. Pears doesn't dispute Boddie and Oliver's assertion that they were acting within the scope of their duties as law enforcement officers when they arrived at the Pears' home in response to the 911 calls. So this court's task is to determine whether, when viewing the evidence in the light most favorable to Mr. Pears, Boddie or Oliver violated clearly established law. The court will first address Mr. Pears' claim that Boddie used excessive force when he shot Jonathan and then address Mr. Pears' claim that Oliver used excessive force in restraining Mr. Pears.

### A. Boddie's Use of Deadly Force Against Jonathan Pears

The court analyzes excessive force claims "under the Fourth Amendment's 'objective reasonableness' standard." *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009). "That standard asks whether the force applied is objectively reasonable in light of the facts confronting the officer, a determination [this court makes] from the perspective of a reasonable officer on the scene and not with the 20/20 vision of hindsight." *Mobley v. Palm Beach Cty. Sheriff Dep't.*, 783 F.3d 1347, 1353 (11th Cir. 2015) (quotations omitted). In determining reasonableness, the court considers "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Conner*, 490 U.S. 386, 396 (1989).

In doing so, the court keeps in mind that "[t]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Powell v. Snook*, 25 F.4th 912, 922 (11th Cir. 2022) (quotations omitted). Instead, it is constitutionally

11

permissible for an officer to use deadly force when he (1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or has committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible. *See id.* (citing *Vaughan v. Cox*, 343 F.3d 1323, 1329–30 (11th Cir. 2003)).

1. *Application of factors:* Applying these factors, the court finds that Boddie's deadly force didn't violate Jonathan's constitutional right to be free from law enforcement's use of excessive force. From Boddie's perspective, he and his fellow deputies were responding to multiple 911 reports of domestic violence involving firearms and a suspect who dispatch reported wanted to commit suicide by cop. Boddie then saw Jonathan emerge from the Pears' home with a machete-style knife that was about two-feet long and refuse to obey the deputies' commands to drop the weapon.

At this stage, the court must resolve the parties' dispute over whether Jonathan raised the knife and began to lunge at Boddie in Mr. Pears' favor. So the court accepts as true Mr. Pears' testimony that Jonathan "slowed down like something had impacted him" when he heard the officer tell him to "drop the fucking knife." The court also accepts as true Mr. Pears' testimony that no one was within 8 feet of Jonathan when he was shot.

But Mr. Pears' evidence hasn't created a genuine dispute of material fact over (a) whether Jonathan was advancing toward Boddie before Boddie shot him, and (b) whether Boddie shot Jonathan from the lawn or the woods. Mr. Pears admitted in his deposition that he did not see who fired the shots or where the shooter was located. (Doc. 89-5, p. 37). And while "from what [he] heard" Mr. Pears thought Boddie's commands and the shots were coming from the woods, "it's possible" that a deputy was on the lawn and Mr. Pears didn't see him. (*Id.*, p. 38). Plus, though Mrs. Pears saw three deputies very close to the woods when she ran outside after the shooting, she admits a fourth deputy was kneeling next to Jonathan. (Doc. 92-1, ¶¶ 50–51).

Because neither Pears saw where the shots came from, Mr. Pears' argument that Boddie may have been in the woods 75 to 90 feet away from Jonathan is based on speculation and conjecture. And while the court must view the evidence in the light most favorable to the nonmoving party, "[s]peculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). So the court finds that, when viewed in the light most favorable to Mr. Pears, the summary judgment record establishes that Jonathan exited the Pears' home holding a two-foot, machete-style knife at his side and walked slowly to the right of the house, which was also toward Boddie's general location. The record further shows that when Boddie yelled at Jonathan to drop the knife, Jonathan "slowed down like something had impacted him" and never raised his knife or yelled at Boddie. But Jonathan also never dropped the knife or came to a complete stop. Boddie was more than 8 feet away from Jonathan when he shot him, and Mr. Pears only saw Boddie and the other deputies form a half circle in the front lawn after the shooting.

Given these circumstances and what the 911 dispatcher had reported about Jonathan's earlier behavior, a reasonable officer could have believed Jonathan posed a serious threat of physical injury or death to Boddie when Boddie shot him. And "where orders to drop [a] weapon have gone unheeded, an officer is not required to wait until an armed and dangerous [suspect] has drawn a bead on the officer or others before using deadly force." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1169 (11th Cir. 2009). So a reasonable officer in Boddie's position could have also concluded that the law did not require Boddie to wait until Jonathan raised the knife or lunged toward him before firing. Thus, the court finds that Boddie's use of deadly force was objectively reasonable and did not violate Jonathan's Fourth Amendment rights.

2. *Caselaw:* Even if the court were wrong about whether Mr. Pears has stated a constitutional violation against Boddie, Mr. Pears still must show that the constitutional violation was clearly established. Violation of a constitutional right is clearly established in one of three ways: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement or principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a

13

constitutional right was clearly violated, even in the total absence of case law." *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009). And "[u]se of excessive force is an area of the law in which the result depends very much on the facts of each case," so "police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quotations omitted).

Mr. Pears points to *Mercado v. City of Orlando*, 407 F.3d 1152 (11th Cir. 2005), and *Perez v. Suszczynski*, 809 F.3d 1213 (11th Cir. 2016), as clearly establishing that Boddie violated Jonathan's right to be free from excessive force. Both cases are distinguishable. In *Mercado*, police responded to a reported attempted suicide. 407 F.3d at 1154. The suicidal individual was armed with a knife pointed at his heart and refused at least two orders to drop the knife. *See id.* But he never made any threatening moves toward the officers, and the officers never warned him that they would use force if he did not drop his weapon. *Id.* Fifteen to 30 seconds later, an officer, who was about 6 feet away, fired a Sage Launcher at the suicidal individual's head, causing him to suffer permanent brain injuries. *See id.* at 1154–55. The Eleventh Circuit reversed the district court's grant of qualified immunity to the officer. *Id.* at 1161. Because the plaintiff was not committing a crime, resisting arrest, or posing an immediate threat to the officers at the time he was shot in the head, the court found that intentionally shooting the Sage Launcher at the plaintiff's head violated his clearly established Fourth Amendment rights. *See id.* at 1157–58, 1160–61.

This case is unlike *Mercado*. Unlike here, the officers in *Mercado* lacked probable cause to believe that the plaintiff had threatened or inflicted physical harm on others. And while the court accepts as true Mr. Pears' testimony that Jonathan was walking slowly and never lunged at Boddie, Mr. Pears' evidence hasn't controverted Boddie's testimony that Jonathan was advancing toward him with the two-foot-long knife in hand. In contrast, Mercado made no movements toward the officers and at all times had the knife pointed toward his own heart. Thus, *Mercado* does not clearly establish that Boddie violated Jonathan's Fourth Amendment right to be free from excessive force.

14

*Perez* also has different facts. Viewing the evidence in the light most favorable to the plaintiff, the summary judgment record in *Perez* established that a deputy shot and killed a compliant, prostrate man twice in the back "execution-style" from around 12 to 18 inches away. *See Perez*, 809 F.3d at 1217. And while the parties agreed that the man was carrying a handgun at some point during the incident, the estate's witnesses testified that a deputy had removed the gun before the shooting. *Id.* at 1217 n.1, 1220. Unsurprisingly, the Eleventh Circuit found that under the plaintiff's version of events, the deputy had violated clearly established law. *See id.* at 1221–23.

Here, Jonathan was armed and advancing toward Boddie when he was shot. So the circumstances Boddie faced are quite different from the ones the deputy faced in *Perez*. To be sure, the court noted in *Perez* that "the mere presence of a gun or other weapon is not enough to warrant the exercise of deadly force and shield an officer from suit. Where the weapon was, what type of weapon it was, and what was happening with the weapon are all inquiries crucial to the reasonableness determination." *Id.* at 1220. The court also explained that in making this evaluation, it considers that "a person standing six feet away from an officer with a knife may present a different threat than a person six feet away with a gun." *Id.*

But this general principle of law doesn't clearly establish that Boddie violated Jonathan's rights either. True, Jonathan was holding a knife, not a gun. But that knife was two feet long and shaped like a machete. Plus, Jonathan was still holding the knife as he advanced toward Boddie, after having refused several commands to drop the weapon. So the comments from *Perez* about how a gun may be more threatening than a knife did not clearly establish that Boddie's use of deadly force was objectively unreasonable.

Binding precedent supports this conclusion. For example, in *Shaw v. City of Selma*, 884 F.3d 1093 (11th Cir. 2018), the Eleventh Circuit found that an officer who shot a mentally ill man coming toward him with a hatchet was entitled to qualified immunity. For the purposes of summary judgment, the court assumed that the man did not raise the hatchet he was holding. *See id.* at 1099. But the court held that the officer was not required "to wait until the hatchet was being swung toward him before firing in self-defense." *Id.* at 1100. Instead, the court held that a reasonable officer could have believed that he

15

was justified in shooting "an armed and noncompliant suspect who had ignored more than two dozen orders to drop the hatchet" and who was "advancing on [the officer] with hatchet in hand." *Id.*

And in *Smith v. LePage*, 834 F.3d 1285, 1295 (11th Cir. 2016), the Eleventh Circuit found that a reasonable officer could have believed that an individual holding a knife who repeatedly disobeyed officers' commands to drop the weapon and moved toward the officers posed a danger to the officers and was resisting arrest. So the officers' use of a single taser discharge to subdue the suspect did not violate his Fourth Amendment rights. *See id.* Similarly, in *Kisela v. Hughes*, 584 U.S. 100, 101, 106 (2018), the Supreme Court found that an officer who fired on a woman who was holding a large kitchen knife, had taken steps toward another woman standing nearby, and had refused to drop the knife after at least two commands to do so, was entitled to qualified immunity. In reaching its decision, the Court noted that "[t]his is far from an obvious case in which any competent officer would have known that shooting Hughes to protect Chadwick would violate the Fourth Amendment." *Id.* at 105–06. The Court also cited a Ninth Circuit case in which officers were found to have not used excessive force when they shot a suspect carrying a sword after the suspect, who was acting erratically, refused commands to drop his weapon, even though he had not directly threatened anyone with the sword. *Id.* at 106 (citing *Blanford v. Sacramento Cnty.*, 406 F.3d 1110, 1112–19 (9th Cir. 2005)).

In sum, Jonathan's shooting was tragic, and Boddie's belief that Jonathan posed a serious threat may have been a mistake. But "[w]hether analyzed under the specific facts of prior decisions or under the narrow obvious clarity exception, instead of clearly establishing the law against [Boddie], binding precedent clearly establishes it in his favor." *Powell*, 25 F.4th at 924 (cleaned up). So the court **WILL GRANT** Boddie's motion for summary judgment on the excessive force claim against him.

### B. Oliver's Use of Force Against Mr. Pears

Mr. Pears' excessive force claim against Oliver is that after Mr. Pears complied with Oliver's instructions to put his hands up, Oliver handcuffed Mr. Pears, drug him toward the street, and tackled him. Oliver argues that the court should grant him summary judgment on this claim because: (1) his use of force was objectively reasonable, (2) Mr. Pears' injuries were *de minimis*, and (3) dragging Mr. Pears down the front yard wasn't a Fourth Amendment seizure.[2]

1. *Objective reasonableness*: Applying the *Graham* factors and viewing the evidence in the light most favorable to Mr. Pears, Oliver's use of force was objectively unreasonable. Mr. Pears had committed no crime, was unarmed, and fully complied with the deputies' commands. Despite Mr. Pears' compliance and nonthreatening demeanor, Mr. Pears says Oliver blind-sided him, throwing him to the ground. (Doc. 89-5, pp. 34–35). Oliver's tackle was so forceful Mr. Pears felt like "a linebacker had hit me," and he "went out as soon as [he] was thrown to the ground." (*Id.*, p. 25). Oliver then dragged Mr. Pears down the bottom of the hill in his front yard and placed his knee on Mr. Pears' back, which constricted Mr. Pears' ability to breathe. (Doc. 92-2, ¶¶ 15–18).

The parties dispute whether Mr. Pears' testimony is that Oliver tackled him before or after he handcuffed him. But either way, Circuit precedent says that Oliver violated Mr. Pears' Fourth Amendment rights if he tackled Mr. Pears when he wasn't resisting. It is clearly established that officers may not use gratuitous force against a subdued, handcuffed, and non-resisting defendant. *See Hadley v. Gutierrez*, 526 F.3d 1324, 1333 (11th Cir. 2008). And even if Mr. Pears weren't handcuffed, it's also clearly established "that the use of force against an arrestee who . . . is not a threat, has not exhibited aggressive behavior, and has not actively resisted arrest is excessive." *Perez*, 809 F.3d at 1222; *see also Smith v. Mattox*, 127 F.3d 1416, 1418–20 (11th Cir. 1997) (denying qualified immunity to officer who ***before fastening handcuffs***,

---

[2] In his reply brief, Oliver also asks the court to deem the excessive force claim against him abandoned. But Mr. Pears' response brief responds to Oliver's motion for summary judgment and points to caselaw that he says shows that Oliver violated his clearly established rights. So the court rejects the argument that Mr. Pears abandoned this claim by not adequately briefing it.

17

broke the arm of previously resisting arrestee who had docilely submitted to arrest).

A jury could also find that it was objectively unreasonable for Oliver to drag Mr. Pears to the bottom of the hill and place his knee on Mr. Pears' back so that he couldn't breathe. The deputies agree that Mr. Pears complied with all their commands. And the Eleventh Circuit has "repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands." *Stephens v. DeGiovanni*, 852 F.3d 1298, 1328 (11th Cir. 2017). So no reasonable officer could have believed that dragging Mr. Pears to the bottom of the hill and placing so much pressure on his back that he struggled to breathe was constitutionally permissible.

*2. De minimis force*: The court recognizes that "the application of *de minimis* force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Saunders v. Duke*, 766 F.3d 1262, 1269 (11th Cir. 2014). But for two reasons, the court rejects Oliver's argument that the court should grant him summary judgment because Mr. Pears' injuries were *de minimis*. First, "this principle has never been used to immunize officers who use excessive and gratuitous force after a suspect has been subdued, is not resisting, and poses no threat." *Id.* at 1269–70. To be certain, "a defendant who is gratuitously beaten . . . does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Id.* at 1270 (cleaned up).

Second, a reasonable jury viewing the evidence in the light most favorable to Mr. Pears could find that Oliver used more than *de minimis* force. Mr. Pears testified that Oliver "bum rushed" him, and that when Oliver threw him to the ground, it felt like a linebacker hit him. He was then dragged down the hill and, at some point, lost consciousness. Plus, the day after the incident, Mr. Pears had a doctor's appointment in which the doctor exclaimed, "Oh my God, who did that to you," when he saw Mr. Pears' injuries. (Doc. 92-2, ¶ 37). While Mr. Pears' shoulder wasn't separated, the doctors did think that it was compressed. (Doc. 89-5, p. 55). So Mr. Pears' doctors referred him to physical

18

therapy to treat his injuries. (Doc. 92-2, ¶ 37). A reasonable juror could decide that this evidence disproves Oliver's argument that he used *de minimis* force.

      3. *Fourth Amendment seizure*: Lastly, the court rejects Oliver's argument that dragging Mr. Pears down the hill wasn't a Fourth Amendment seizure. "In order for there to be a violation of the Fourth Amendment because of the use of excessive force, it must have been applied during the course of the seizure and not at some other time." *West v. Davis*, 767 F.3d 1063, 1070 (11th Cir. 2014). And "[a] seizure requires the use of force with intent to restrain . . . force intentionally applied for some other purpose [does not] satisfy this rule." *Torres v. Madrid*, 592 U.S. 306, 317 (2021).

      Oliver says that he didn't drag Mr. Pears down the hill with the intent to restrain him. Instead, he says that he was intending to redirect Mr. Pears away from harm (*i.e.*, Jonathan). That may prove true, but Mr. Pears' evidence suggests that Oliver dragged Mr. Pears down the hill to restrain him rather than protect Mr. Pears from Jonathan. For example, Mr. Pears' declaration suggests that Mr. Pears was already at the bottom of the hill when Jonathan exited the house. (*See* Doc. 92-2, ¶¶ 15–19). And Mr. Pears disagrees with the deputies' assertion that Jonathan ever approached him with the knife. (*Id.*, ¶ 19). So viewing the evidence in the light most favorable to Mr. Pears, Oliver applied physical force by dragging Mr. Pears down the hill with the intent to restrain Mr. Pears' physical movement rather than to prevent Jonathan from harming Mr. Pears.

—

      In sum, if a reasonable juror believes Mr. Pears' version of events, that juror could find that Oliver "use[d] gratuitous and excessive force against a suspect who [was] under control, not resisting, and obeying commands." *Stephens*, 852 F.3d at 1328. So the court will **DENY** Oliver's motion for summary judgment on Mr. Pears' claim that Oliver used excessive force against him.

## CONCLUSION

For these reasons, the court **GRANTS IN PART** and **DENIES IN PART** Boddie and Oliver's motion for summary judgment (doc. 88). The court **GRANTS** Boddie's motion for summary judgment on the claim that he used excessive force against Jonathan and will **DISMISS** that claim **WITH PREJUDICE**. The court **DENIES** Oliver's motion for summary judgment on the claim that he used excessive force against Mr. Pears. That claim will go to trial.

The court will enter a separate order that carries out this ruling.

**DONE** and **ORDERED** on February 11, 2025.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE